Filed 8/27/24  P. v. Zavalza Ruiz CA6

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE, | H049946 |
| Plaintiff and Respondent, | (Santa Cruz County Super. Ct. No. 21CR05405) |
| v. | |
| ALEJANDRO ZAVALZA RUIZ, | |
| Defendant and Appellant. | |

Early in the morning on April 13, 2021, defendant Alejandro Zavalza Ruiz was driving a car with his girlfriend, D.G.,[1] as the sole passenger.  Zavalza Ruiz was angry because D.G. had earlier told him that she wanted to end their relationship.  D.G. had tried to run from the car but Zavalza Ruiz caught her and dragged her back.  While driving, Zavalza Ruiz intentionally crashed the passenger side of the car into a tree, severely injuring D.G.  A jury convicted Zavalza Ruiz of, among other crimes, domestic violence after a prior conviction with an enhancement for infliction of an injury causing paralysis and was sentenced to a total term of 10 years.

---

[1] Although the victim was identified in the first amended information and at trial by name, we will instead use her first and last initials in order to protect her privacy interests.  (Cal. Rules of Court, rule 8.90(b)(4).)  Unspecified rule references are to the California Rules of Court.

On appeal, Zavalza Ruiz raises three arguments: 1) the five-year great bodily injury enhancement (Pen. Code, § 12022.7, subd. (b))[2] must be stricken because there is insufficient evidence in the record to support the jury's finding that D.G.'s paralysis was "permanent in nature," 2) the trial court erred by failing to conduct a sufficient inquiry into possible juror bias resulting in misconduct, and 3) the court erred by admitting evidence of his prior acts of domestic violence.

We disagree with Zavalza Ruiz's arguments in their entirety and will affirm the judgment.

## I.    FACTUAL AND PROCEDURAL BACKGROUND

### A. Procedure

On February 17, 2022, the Santa Cruz County District Attorney filed a first amended information (information) charging Zavalza Ruiz with one felony count of inflicting corporal injury upon D.G., a person with whom Zavalza Ruiz had a dating relationship, while having a specified prior conviction within seven years (§ 273.5, subd. (f)(1); count 1); one felony count of reckless driving causing a specified injury (Veh. Code, § 23105, subd. (a); count 2); and one misdemeanor count of driving without a valid license (Veh. Code, § 12500, subd. (a); count 3).

As to count 1, the information further alleged that Zavalza Ruiz personally inflicted great bodily injury and injury causing D.G. to become comatose due to brain injury and/or suffer paralysis (§ 12022.7, subds. (a), (b) & (e)). The information also alleged the following aggravating circumstances: 1) The crimes involved great violence and great bodily harm (rule 4.421(a)(1)); 2) the victim was particularly vulnerable (rule 4.421(a)(3)); 3) Zavalza Ruiz took advantage of a position of trust or confidence to commit the offense (rule 4.421(a)(11)); 4) Zavalza Ruiz's violent conduct indicates a

_____

[2] Unspecified statutory references are to the Penal Code.

2

serious danger to society (rule 4.421(b)(1)); 5) Zavalza Ruiz's prior convictions were increasing in seriousness (rule 4.421(b)(2)); 6) Zavalza Ruiz had served a prior prison term (rule 4.421(b)(3)); 7) Zavalza Ruiz committed the charged offenses while he was on probation or parole (rule 4.421(b)(4)); and 8) Zavalza Ruiz's prior performance on probation or parole was unsatisfactory (rule 4.421(b)(5)).

At the conclusion of the trial, the jury convicted Zavalza Ruiz on all counts and found all of the special allegations true. In a bifurcated proceeding, the trial court found true each of the aggravating sentencing factors alleged in the information.

On April 18, 2022, the trial court sentenced Zavalza Ruiz to a total term of 10 years in prison, consisting of the upper term of five years on count 1 plus a consecutive five-year term for the great bodily injury causing "brain [in]jury and [] paralysis" enhancement (§ 12022.7, subd. (b)). The court imposed and stayed, pursuant to section 654, upper term sentences of three years and five years for the additional great bodily injury enhancements alleged in connection with count 1 (§ 12022.7, subds. (a), (e)). As to count 2, the court imposed an upper term of three years, stayed under section 654. On count 3, the court imposed a concurrent sentence of 180 days.[3] The trial court awarded 295 custody credits plus 44 days of conduct credits, calculated at 15 percent pursuant to section 2933.1, for a total of 339 days.

The trial court imposed a $300 restitution fund fine (§ 1202.4, subd. (b)), a parole violation restitution fund fine of $300 (§ 1202.45) (suspended), a $40 court operations assessment (§ 1465.8, subd. (a)(1)), and a $30 court facilities assessment (Gov. Code,

---

[3] In a separate matter (Santa Cruz County Superior Court Case No. 20CR00148), the court revoked probation and sentenced Zavalza Ruiz to a consecutive one-year term (one-third the middle term) for felony infliction of corporal injury on a victim of domestic violence (§ 273.5, subd. (a)).

§ 70373).  The court made a general order of restitution to D.G., N.G.,[4] and the California Victims Compensation Board.

Zavalza Ruiz timely appealed.

### B. Facts

#### 1. Prosecution case

##### a. D.G. and Zavalza Ruiz's relationship[5]

N.G. testified that, at the time of trial, D.G. was 27 years old and had three children under the age of ten.  Before April 13, 2021,[6] D.G. and her children were living in their own house in Watsonville.  D.G. was separated from the father of her children.  N.G. did not know Zavalza Ruiz, but in April she overheard D.G. talking on the phone or talking with her sisters "about going out with her friend Psycho" which she understood was Zavalza Ruiz's nickname.

S.R., Zavalza Ruiz's mother, testified that she did not have a positive relationship with her son.  She did not know where he lived most of the time, though he would sometimes stay at her house off and on "for a few days."  In early 2021, S.R. knew that Zavalza Ruiz was dating D.G. though she only "recently found out her name."  She saw D.G. at her house with Zavalza Ruiz "less than five times" but believed that D.G. only spent the night on one occasion, "the day of the accident."  Zavalza Ruiz told S.R. that D.G. was pregnant with his child and he "was gonna change his ways for this child."

---

[4] N.G. is D.G.'s mother and although she was also identified at trial by name, we will instead use her first and last initials in order to protect D.G.'s privacy interests. (Rule 8.90(b)(11).)  We refer to other witnesses by their initials for the same reasons. (Rule 8.90(b)(10).)

[5] As D.G. did not testify at trial, the events were presented through other witnesses.

[6] All dates are from 2021 unless otherwise specified.

V.L., Zavalza Ruiz's sister, testified she lived with her mother, S.R., but did not have a close relationship with Zavalza Ruiz. V.L. knew that Zavalza Ruiz was dating D.G. and thought D.G. might have slept over at her house twice. V.L. knew that D.G. was pregnant because Zavalza Ruiz "was really excited about it."

Early in the morning on April 13, V.L. could hear Zavalza Ruiz and D.G. arguing in the living room for about 20 minutes. V.L. thought it sounded like Zavalza Ruiz was "late for work or something." She later heard the front door close as Zavalza Ruiz and D.G. left for work.

C.A., D.G.'s sister and current caregiver, was not aware that D.G. was dating anyone in March or April and had never met Zavalza Ruiz. C.A.'s family called him "Psychopath" because around 9:00 p.m. on April 2 she was talking to D.G. on the phone and could hear someone outside D.G.'s house screaming at her to open the door. C.A. asked who it was and advised D.G. not to open the door because "it didn't sound safe." D.G. responded that it was "some guy, he's a psychopath, and he's obsessed with me."

On Easter, April 4, C.A. spent the day with D.G. and other family preparing baskets for the children. Zavalza Ruiz called multiple times, but D.G. did not want to talk to him so she lied, saying she was in church. Later that day, C.A. overheard D.G. talking to Zavalza Ruiz on the phone and heard Zavalza Ruiz tell D.G. "he would kill her, then kill himself." C.A. walked into the room and, after D.G. put the phone on mute, C.A. asked why he was saying that. D.G. said she did not know but Zavalza Ruiz was "weird like that."

### b. The collision and D.G.'s injuries

On April 13, video surveillance footage at Taylor Farms, Zavalza Ruiz's workplace, showed Zavalza Ruiz and D.G. driving onto the site at 4:53 a.m., but then exiting again at 5:06 a.m. D.G. later told N.G. that Zavalza Ruiz was angry because she told him she did not want to be with him. D.G. said she tried to run away, but Zavalza

5

Ruiz grabbed her by the hair, hit her, and dragged her back to the car. Zavalza Ruiz drove off with D.G. in the front passenger seat and, as they drove, he kept pressing the brake "so that she would hit herself" and refused to stop. Zavalza Ruiz then "wrecked the car into a tree" and "tried to kill her."

Early in the morning of April 13, T.B. was driving on Highway 129 toward Santa Cruz with his friend E.[7] when he saw a wrecked car on the side of the road. According to T.B., that portion of the highway was "straight for a while, and then it had a pretty sharp turn" and the accident was just after that turn. T.B. saw a man standing by the car, so T.B. pulled over to see if he could help. The man, identified as Zavalza Ruiz, did not speak English, but E. spoke Spanish, so he talked to Zavalza Ruiz. T.B. noticed D.G. in the passenger seat of the car, screaming in pain. T.B. opened the door and saw that D.G's leg was badly injured, "kind of twisted" and "misshaped." T.B. thought it would be faster to transport D.G. to the hospital than to wait for an ambulance, so he and E. pulled her from the car and drove her and Zavalza Ruiz to Watsonville Community Hospital. T.B. estimated he and E. were at the crash site around 15 to 20 minutes, and it took 10 to 15 minutes to get to the hospital.

Zavalza Ruiz and D.G. arrived at the hospital before 6:30 a.m. and were examined in the emergency room. Amy Grooters, the nurse manager on duty that morning, testified that Zavalza Ruiz did not appear to have any serious injuries, but D.G.'s legs were "significantly fractured" and she seemed to be unaware of her surroundings. As Zavalza-Ruiz and D.G. were being treated, Grooters overheard Zavalza Ruiz ask D.G. why she did not love him.

---

[7] E.'s last name does not appear in the record.

6

Dr. Linda Truong treated D.G. and Zavalza Ruiz on their arrival at Watsonville Community Hospital. Zavalza Ruiz told Dr. Truong he had "severe low back pain"[8] and he had an abrasion on his head. D.G. had severe injuries to both legs, with "open fractures to both … femurs," meaning that Dr. Truong could see bone protruding from D.G.'s skin on one or both legs. When D.G. was told that her legs were broken, she yelled at Zavalza Ruiz, " 'You broke my legs, you broke my fucking legs.' " Dr. Truong did a trauma assessment and determined that D.G. needed to be airlifted to the trauma center at Natividad Hospital in Salinas.

N.G. saw D.G. in the emergency room at Natividad Hospital. D.G. was wearing a neck brace and bandages on her legs. D.G. looked scared and kept saying "Taylor Farms" and "I'm scared he's gonna kill me." D.G. complained of having a headache and pain in her back. At some point, D.G. asked to call her siblings, so N.G. placed a video call to her husband and then D.G.'s siblings. D.G.'s eyes started rolling and she "wasn't talking much anymore." She complained that her head hurt, and staff took her to the intensive care unit. D.G. had a stroke and was again airlifted, this time to the stroke center at San Jose Regional Medical Center (SJMRC).

Dr. Kelly Gonzales treated D.G. on her arrival at SJMRC and reviewed the records and imaging from Natividad Hospital.[9] D.G. was unable to follow commands and was only moving one side of her body. Dr. Gonzales determined that D.G. had bleeding both

---

[8] The CT scan of Zavalza Ruiz's back showed "some abnormalities" in his middle and low back, but the radiologist indicated these appeared to be "an old issue" rather than from the collision that day.

[9] Dr. Gonzales confirmed that D.G. was pregnant, and that "blunt trauma [] can [cause] injury to a fetus and … miscarriage." However, it was too early in the pregnancy to monitor the fetus. The record contains no post-incident information regarding D.G.'s pregnancy.

within and outside her brain tissue. D.G. had a clot or some other disruption to her carotid artery and a clot in her right middle cerebral artery, causing brain injury.

Surgeons first performed a thrombectomy to remove the blood clot in her cranial artery, and a couple of days later, they performed a craniectomy which involved opening her skull to relieve built-up pressure. D.G. also underwent surgery to repair her broken legs, and at the time of trial, still had titanium rods in her legs.

When she was discharged on May 1, D.G.'s neurological "status had improved some … but she still wasn't following commands." She could not talk, was able to "barely" breathe on her own, and "was only really able to move one side" of her body. In Dr. Gonzales's opinion, D.G. was permanently disabled at time of discharge. Dr. Gonzalez testified that there was a broad range of outcomes for patients with neurological injuries, but "most patients in [D.G.'s] situation do not improve to the point where they might be able to work again." Dr. Gonzalez did not use the word "paralysis" to describe D.G.'s movement problems because her impairment was due to brain injury not injury to her spinal cord.

After D.G. returned to Natividad, N.G. testified that D.G. "had multiple surgeries" and was fed through a tube because "she also had … a tracheotomy." D.G. had aphasia and was relearning how to speak. Although D.G. is left-handed, she could no longer use her left hand, and could only move her left leg a little. After her discharge from Natividad, D.G. moved in with N.G. since she could not care for herself any longer.

At N.G.'s home, C.A. helps D.G. with her speech, as well as changing her clothes and using the bathroom. C.A. cooks for D.G. and cares for D.G.'s children as well.

### c. Police investigation of the crash

On April 13, at around 6:48 a.m., California Highway Patrol (CHP) Officer Fred Smith responded to a call about an abandoned and damaged vehicle. Smith saw D.G.'s vehicle, a maroon Honda Accord, on the side of the road with a smashed front end. The

8

front and side airbags had deployed but most of the damage was to the passenger side of the vehicle where it had impacted a tree. The crash site was on a straight part of the road ahead of a curve.

Another CHP officer arrived on scene, and Smith drove to Watsonville Community Hospital after learning that D.G. and Zavalza Ruiz were being treated there. Smith saw D.G. was bleeding heavily and screaming at Zavalza Ruiz that he had broken her legs. In a records check, Smith determined that Zavalza Ruiz's driver's license was revoked.

Smith returned to the crash site to continue his investigation and photographed skid marks on the pavement and a damaged tree. In Smith's opinion the tire marks showed "there was more of a right turn involved at a higher speed than what you would expect" and led directly to the damaged tree. Around the tree, Smith observed plastic vehicle debris that appeared to have come from D.G.'s car.

CHP Sergeant Troy Vincent testified as an expert in traffic collision accident investigation, reconstruction, and tire friction mark analysis. On April 14, Vincent met with Smith at the scene of the collision and observed three tire friction marks which he believed were from the vehicle's front and rear left tires and one of the tires on the right side. The marks led straight to the damaged tree. In Vincent's opinion, the friction marks were caused when the vehicle turned right "at too great a speed," which caused it to "slip[] to the left." The driver was "[m]ostly" in control, but Vincent could not tell from the marks if the driver was applying the brakes to some degree or even slightly accelerating. Vincent "guess[ed]" the vehicle was traveling around or slightly below the posted speed limit. Based on his review of the damage to the vehicle, the friction marks, and the tree, Vincent believed the vehicle turned and the front passenger side collided with the tree.

9

Larry Iunker, a motor carrier specialist and civilian employee of the CHP's Multidisciplinary Accident Investigation Team, testified as an expert in mechanical inspection and on whether D.G.'s car was performing as designed prior to the collision. Iunker testified that D.G.'s vehicle was in good used condition, with "plenty" of tire tread left. Iunker's inspection of the vehicle did not disclose any mechanical problem that might have caused it to crash.

### d. Prior incidents of domestic violence

R.H. testified that he was driving home around noon on May 8, 2015, when he saw a man and a woman, later identified as Zavalza Ruiz and B.C., having some sort of disagreement. Zavalza Ruiz started hitting B.C. before putting his arm around her and pulling her to the ground. R.H. stopped his car and asked B.C. if she was okay. R.H. looked down to get his phone and suddenly noticed that Zavalza Ruiz was holding a gun[10] against his chest. Zavalza Ruiz told R.H., " 'Don't mess with me' " and he walked away with B.C. R.H. called the police who apprehended Zavalza Ruiz minutes later. Zavalza Ruiz admitted to police that B.C. was his girlfriend.

A.C. testified that she dated Zavalza Ruiz for a couple of months in 2017. Towards the end of their relationship, Zavalza Ruiz became aggressive, strangling her with her shirt or holding her arms and telling her she had to stay with him. One day, A.C. got out of school and Zavalza Ruiz pulled her down by her backpack and got on top of her. He put his hands on her neck and told her she could not go home. A.C. was yelling for help and someone called the police. On May 24, 2017, Zavalza Ruiz was convicted of felony false imprisonment of A.C.

M.V. testified that she met Zavalza Ruiz at a party in December 2019 and they dated for a month and a half. Zavalza Ruiz was "sweet [and] charming" at first, but soon

---

[10] Police later determined the gun was fake, though it looked very real to R.H.

became violent, angry, and jealous, accusing M.V. of "things," calling her names, and putting her down. After hitting her, Zavalza Ruiz would cry, apologize, and say that he "didn't have love growing up." Zavalza Ruiz would also blame M.V. for his anger and tell her it was her fault that he hit her. On one occasion, they got into an argument in his car and Zavalza Ruiz pulled out a knife. He hit her in the face, giving her a bloody nose. M.V. got out of the car, but Zavalza Ruiz ran after her and pulled her back into the car in front of the neighbors. About a week after that incident, Zavalza Ruiz got angry with what M.V. was wearing and pushed her. When M.V. pushed him back, he grabbed her, slapped her across the face, and threw her to the floor. M.V.'s face hit the bed frame and her fingernail was ripped off.

M.V. then went to the police and reported what Zavalza Ruiz had done to her. On February 18, 2021, Zavalza Ruiz was convicted of two counts of inflicting corporal injury on M.V. resulting in a traumatic condition.

## II. DISCUSSION

### A. *Sufficiency of the evidence to support great bodily injury enhancement*

Zavalza Ruiz argues that there was insufficient evidence presented at trial to support the jury's finding that he inflicted great bodily injury on D.G. resulting in permanent paralysis. We agree with the Attorney General that the evidence in the record is sufficient to meet the standard required by section 12022.7, subdivision (b).

#### 1. *Additional background*

Prior to beginning deliberations, the jury was instructed with CALCRIM No. 3161 which stated that the burden was on the prosecution to prove beyond a reasonable doubt that Zavalza Ruiz "personally inflicted great bodily injury on [D.G.]" and that he "caused [D.G.] to suffer permanent paralysis." During deliberations, the jury requested a readback of Dr. Gonzales's testimony and also asked for a "legal definition of 'permanent' as noted in Count 2, special allegation regarding paralysis." After discussing

11

the inquiry with counsel, the court directed the jury to refer to the sixth paragraph of CALCRIM No. 200 which provides: "Some words or phrases used during this trial have legal meanings that are different from their meanings in everyday use. These words and phrases will be specifically defined in these instructions. Please be sure to listen carefully and follow the definitions that I give you. Words and phrases not specifically defined in these instructions are to be applied using their ordinary, everyday meanings."

The jury subsequently asked the court to provide a legal definition of " 'permanent[,]' " and whether it meant "1 year, 2 years, life???"[11] Following a discussion with counsel, the court instructed the jury that "Webster's New World Dictionary defines 'permanent' as 'lasting or intended to last indefinitely without change.' You should accept this as how the word is applied in its ordinary, everyday meaning."[12]

### 2. Applicable legal standards

Section 12022.7, subdivision (b) states: "Any person who personally inflicts great bodily injury on any person other than an accomplice in the commission of a felony or attempted felony which causes the victim to become comatose due to brain injury or to suffer paralysis of a permanent nature shall be punished by an additional and consecutive term of imprisonment in the state prison for five years. As used in this subdivision,

---

[11] The jury also asked for the transcripts of the "day in the life" video showing D.G.'s condition at the time of trial. The court provided those transcripts but instructed the jury that "[t]he recording is the evidence" and the transcripts were to be used only to assist the jurors in hearing the words spoken on the video.

[12] Defense counsel initially objected to the trial court providing the jury with a "dictionary definition" of "permanent." However, when the trial court stated that it would respond to the jury with the definition described above, defense counsel replied, "That's fine."

12

'paralysis' means a major or complete loss of motor function resulting from injury to the nervous system or to a muscular mechanism."[13]

"In assessing a claim of insufficiency of evidence, the reviewing court's task is to review the whole record in the light most favorable to the judgment to determine whether it discloses substantial evidence—that is, evidence that is reasonable, credible, and of solid value—such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt. [Citations.] . . . [R]eview for sufficiency of evidence entails not the determination whether the reviewing court itself believes the evidence at trial establishes guilt beyond a reasonable doubt, but, instead, whether, after reviewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. [Citations.]" (*People v. Rodriguez* (1999) 20 Cal.4th 1, 11 (*Rodriguez*).) "We review the sufficiency of the evidence to support an enhancement using the same standard we apply to a conviction." (*People v. Wilson* (2008) 44 Cal.4th 758, 806.)

### 3. Analysis

Zavalza Ruiz contends that Dr. Gonzales did not testify that D.G.'s "injuries were permanent," but "only that they may or may not be." He also points to N.G.'s testimony

---

[13] In the course of addressing Zavalza Ruiz's sufficiency of the evidence argument, the Attorney General asserts that the statute's phrase "paralysis of a permanent nature" "allow[s] for some improvement and change" and does not require that the victim's condition be forever unchanged. The Attorney General then goes on to argue that, in interpreting what the Legislature meant by "permanent" when it enacted section 12022.7, subdivision (b), we should look to the crime of mayhem. Zavalza Ruiz does not argue in his opening brief that the language of section 12022.7, subdivision (b) is ambiguous and that we must employ the rules of statutory construction to interpret it. Because we conclude that the plain language of section 12022.7 is unambiguous, we need not and do not address the Attorney General's additional statutory construction argument. "When the language of a statute is clear, we need go no further." (*People v. Flores* (2003) 30 Cal.4th 1059, 1063.)

that "there have been improvements" in D.G.'s condition. In his opening brief, Zavalza Ruiz writes that D.G. "has been able to move her left arm, and although doctors did not believe she would be able to move her left leg, she has been able to move it." In addition, N.G. testified that D.G. could now recognize her family, was alert, and could "eat again after they said she wouldn't eat." D.G. could also "walk" and her "ability to speak has improved." We are unpersuaded.

We reject Zavalza Ruiz's suggestion that there was insufficient evidence that D.G.'s injuries are "permanent" because she has experienced improvement in the functionality of her left arm and leg. Whether D.G. has regained *some* use of those limbs is not dispositive of the question of whether her paralysis is "permanent." The jury was instructed that the "ordinary, everyday meaning" of the word "permanent" was " 'lasting or intended to last indefinitely without change.' " The jury was also provided with section 12022.7, subdivision (b)'s definition of "paralysis" as "a major … loss of motor function resulting from injury to the nervous system."

The prosecution presented substantial evidence at trial to support the jury's conclusion that D.G. suffered a permanent "major … loss of motor function" due to the collision. Dr. Gonzales did not testify that D.G. would ultimately regain any significant degree of motor function, but rather stated, "[t]here is a lot of damage that can happen to the brain that can't recover." According to N.G., at the time of trial, D.G. was still unable to lift her dominant (left) hand and had only limited movement in her left leg. C.A. testified that she lived with D.G. in order to help her with speaking, changing her clothes, and using the bathroom. The jury also saw the "day in the life" video of D.G. taken after the crash.[14] The evidence that D.G. had suffered a "permanent" or "lasting" "major … loss of motor function" (§ 12022.7, subd. (b)) was "reasonable, credible, and of solid

_____

[14] D.G.'s stepfather, V.A., testified that the video of D.G. with her physical therapist was recorded in "July or August" of 2021.

14

value." (*Rodriguez, supra,* 20 Cal.4th at p. 11.) To the extent that the evidence of D.G.'s ongoing loss of motor function was disputed, there was substantial evidence to support the jury's conclusion that the paralysis suffered by D.G. was of a "permanent nature" within the meaning of section 12022.7, subdivision (b).

### B. Inquiry into possible juror bias

Zavalza Ruiz next argues that the trial court abused its discretion by declining to hold an evidentiary hearing regarding juror misconduct after one of the jurors (Juror No. 7) reported during deliberations that he heard Juror No. 4 say that he wanted to "get this guy [i.e., Zavalza Ruiz]" and had to "get this guy." The Attorney General counters that the trial court's limited inquiry into the matter was sufficient. We agree with the Attorney General that the trial court did not abuse its discretion by not conducting an evidentiary hearing.

### 1. Additional background

Prior to beginning deliberations on March 7, 2022, the trial court instructed the jurors with CALCRIM No. 3550, as follows: "It's your duty to talk with one another and to deliberate in the jury room. You should try to agree upon a verdict, if you can. Each of you must decide the case for yourself, but only after you discuss the evidence with the other jurors. [¶] Don't hesitate to change your mind if you become convinced that you are wrong. But don't change your mind just because other jurors disagree with you. Keep an open mind and openly exchange your thoughts and ideas about the case. Stating your opinions too strongly at the beginning or immediately announcing how you plan to vote may interfere with an open discussion. [¶] Please treat one another courteously.

15

Your role is to be an impartial judge of the facts, not to act as an advocate for one side or the other."[15]

On March 8, 2022, the bailiff informed the trial court that one of the jurors had approached him and said he was "having an issue with another … juror[]." The court, through the bailiff, gave the juror a blank form and asked that he describe the issue on that piece of paper. On that form, Juror No. 7 wrote that Juror No. 4 "mentioned during deliberations that, quote, I really want to get this guy, I've got to get this guy, end quote. He reiterated this point a couple of times. I felt it was inappropriate and told the bailiff … ."

After the trial court asked counsel for their thoughts, defense counsel said, "I think we need to have a conversation with this juror[16] to see if that's accurate. And I don't know if we have to poll every juror to see who heard that. It sounds like he's not deliberating and he's made up his mind." The prosecutor countered that it was not clear from the note whether Juror No. 4 was interfering with deliberations or that he had improperly made up his mind *prior to* the jury starting deliberations.

The court determined that it would first "confirm with Juror [No.] Seven that the first time he heard any statement or sentiment expressed like this was after deliberations had commenced … And then we'll decide where to go from there." In a hearing outside the presence of the rest of the jurors, Juror No. 7 confirmed that he had not heard Juror No. 4 make any comments about wanting to "get" Zavalza Ruiz until after the close of evidence and after final arguments had been made. Juror No. 7 did add that he heard

---

[15] Before giving this instruction, the trial court also instructed the jurors, pursuant to CALCRIM No. 200, that they must not "let bias, sympathy, prejudice or public opinion influence [their] decision."

[16] Defense counsel did not specify whether he was referring to Juror No. 7 or Juror No. 4 but his subsequent statement that it "sounds like he's not deliberating" implies that counsel was talking about Juror No. 4.

16

Juror No. 4 "scoffing a couple times during the trial when the defense attorney was speaking." In response to the court's question as to whether Juror No. 4 had "said or done" anything that made him uncomfortable about deliberating or discussing the case with the other jurors, Juror No. 7 said, "No." The court directed Juror No. 7 to return to the deliberation room.

Defense counsel stated that Juror No. 4 appeared to have violated his oath and had made up his mind during trial. Counsel and the court agreed that the court could not inquire into the jury's deliberative process. The court also noted that, during jury selection, Juror No. 4 "said he couldn't presume innocence on the driving on a suspended license charge."[17]

After further discussion, the court stated that Juror No. 4's remarks fell "in a category of a juror proclamation. And it's only misconduct if the proclamation is based on outside evidence. … It is not an example of a statement the juror had reached this

---

[17] The exchange during jury voir dire on this issue was as follows: "[Juror No. 4]: I question my ability to enter into the principle of innocent before guilty in terms of the charge of driving without a license. I can't fathom that somebody was charged with driving without a license when in fact they had a license. I am assuming guilty. I just can't—I am not trying to be a wise guy. [¶] THE COURT: Okay. No, I appreciate that. So let me ask you this. What I heard you say is if someone is driving a vehicle *and it's established they don't have a valid driver's license* … you're having difficulty presuming innocence? [¶] [Juror No. 4]: Yes. [¶] THE COURT: Is the mere fact that someone might be guilty of that crime, do you think it's going to lead you to the conclusion if the District Attorney is charging with that crime and he can prove it, they must be guilty of the other? [¶] [Juror No. 4]: No, I don't -- no. *I am not presuming guilt on any of the other charges*." (Italics added.)

The following day, before the jury was impaneled, defense counsel explored this matter with Juror No. 4 further, asking if the prosecution failed to produce evidence on the charge, would Juror No. 4 still vote to convict? Juror No. 4 replied that if the prosecutor did not prove that Zavalza Ruiz did not have a driver's license, "then it's not guilty." Defense counsel did not challenge Juror No. 4 for cause nor did he use a peremptory challenge to excuse him.

17

state of mind before commencement of jury deliberations[,] … [or] a premature discussion among jurors.  It was a statement made while all other jurors were present."  Defense counsel argued that Juror No. 4 had committed misconduct on its face by "improperly influencing or advocating in the jury room" and moved for a mistrial.

The trial court denied the motion for a mistrial, stating that it was clear the statements were made during deliberations and there was "no way for us to determine" if Juror No. 4 violated his oath "without violating the rule that we cannot inquire about the jurors' deliberative process as to whether this proclamation constitutes prejudgment or just his view of evidence in the case."  In the court's view, "Case law says, even at a post trial post judgment motion for new trial, you can't inquire to the content of jury deliberations, the deliberative process or mental state of jurors during the deliberative process.  They're protected by Evidence Code section 1150, and the hearing should not be conducted to engage in a fishing expedition to search for possible jury misconduct.  It should only be held [] when the defense has come forward with evidence demonstrating the strong possibility that prejudicial misconduct has occurred.  [¶]  I'm going to decline to remove (JUROR NUMBER FOUR) at this point.  I'm declining to engage in further questioning."

### 2. Applicable legal principles

" ' "An accused has a constitutional right to a trial by an impartial jury. [Citations.]  An impartial jury is one in which no member has been improperly influenced [citations] and every member is ' "capable and willing to decide the case solely on the evidence before it" [citations]." [Citation.]' " (*People v. Ramirez* (2022) 13 Cal.5th 997, 1092.)  "[A]n important element of trial by jury is the conduct of deliberations in secret, free from ' " 'intrusive inquiry into the sanctity of jurors' thought processes.' [Citation.]" ' [Citation.]  Secrecy affords jurors the freedom to engage in frank discussions, free from fear of exposure to the parties, to other participants in the trial, and to the public."

18

(*People v. Engelman* (2002) 28 Cal.4th 436, 442 (*Engelman*).)  The California Supreme Court, however, has "recognized that the secrecy of deliberations 'may give way to reasonable inquiry by the court when it receives an allegation that a deliberating juror has committed misconduct.' "  (*People v. Nelson* (2016) 1 Cal.5th 513, 569, quoting *Engelman, supra*, 28 Cal.4th at p. 443.)  Thus, the Supreme Court has held that the trial court must hold "an inquiry sufficient to determine the facts" once it has "notice that good cause to discharge a juror may exist."  (*People v. Burgener* (1986) 41 Cal.3d 505, 519, disapproved of on another ground as stated in *People v. Reyes* (1998) 19 Cal.4th 743, 756.)

However, " 'not every incident involving a juror's conduct requires or warrants further investigation.'  [Citation.]  'The decision whether to investigate the possibility of juror bias, incompetence, or misconduct—like the ultimate decision to retain or discharge a juror—rests within the sound discretion of the trial court.  [Citation.]  The court does not abuse its discretion simply because it fails to investigate any and all new information obtained about a juror during trial.  [¶]  . . . [A] hearing is required only where the court possesses information which, if proven to be true, would constitute "good cause" to doubt a juror's ability to perform his [or her] duties and would justify his [or her] removal from the case.' "  (*People v. Manibusan* (2013) 58 Cal.4th 40, 53; see *People v. Ray* (1996) 13 Cal.4th 313, 342–344 [trial court did not abuse its discretion when it did not make a further inquiry after receiving note that juror knew daughter of victim from school because note indicated that juror did not talk with the daughter about the case]; *People v. Kaurish* (1990) 52 Cal.3d 648, 694 (*Kaurish*) [no hearing required when juror made derogatory remark directed toward defense counsel absent inference that remark was result of improper or external influences].)

As the reviewing court, our inquiry focuses not on whether "there is uncertainty in the record concerning what occurred because the trial court did not conduct an inquiry,"

but "whether the information the trial court was aware of when it made its decision warranted further inquiry." (*People v. Fuiava* (2012) 53 Cal.4th 622, 703 (*Fuiava*).) In reviewing the trial court's ruling for abuse of discretion, we reverse only upon "a showing the trial court exercised its discretion in an arbitrary, capricious, or patently absurd manner that resulted in a manifest miscarriage of justice [citation]." (*Rodriguez, supra,* 20 Cal.4th 1, 9–10.)

### 3. Analysis

In this case, the court conducted a reasonable inquiry into Juror No. 4's statements by questioning Juror No. 7 and confirming that those statements were made during deliberations, *after* the jury heard the evidence and arguments of counsel, as opposed to during trial. "It is not uncommon, or grounds for discharge, 'for a juror (or jurors) in a trial to come to a conclusion about the strength of a prosecution's case early in the deliberative process and then refuse to change his or her mind despite the persuasive powers of the remaining jurors.' " *(People v. Armstrong* (2016) 1 Cal.5th 432, 453; quoting *People v. Bowers* (2001) 87 Cal.App.4th 722, 734.)

There is nothing in the record to support Zavalza Ruiz's contention that Juror No. 4 had violated his oath by either prejudging the outcome during trial or by refusing to deliberate. Even if, as Juror No. 7 stated, Juror No. 4 "scoff[ed] a couple of times during the trial when the defense attorney was speaking," this is not sufficient to show juror misconduct or bias. There is nothing in the record to show that Juror No. 4's audible expressions of disbelief were "the result of 'improper or external inferences,' but [were] rather his or her momentary exasperation with the proceedings." (*Kaurish*, *supra*, 52 Cal.3d at p. 694.)

Similarly, while Juror No. 4, during jury selection, expressed doubt about his ability to presume Zavalza Ruiz's innocence on the charge of driving without a valid license, he never unequivocally stated that he was incapable of setting aside his

impressions and rendering a verdict based on the evidence. The trial court and defense counsel appropriately clarified with Juror No. 4 that his verdict on that charge would be dependent on the prosecution "establish[ing] [Zavalza Ruiz did not] have a valid driver's license … ." The court also clarified that, if the prosecution were to prove the charge of driving without a valid license, Juror No. 4 would not therefore automatically conclude that Zavalza Ruiz was guilty of the other charges. "To hold that the mere existence of any preconceived notion as to the guilt or innocence of an accused, without more, is sufficient to rebut the presumption of a prospective juror's impartiality would be to establish an impossible standard. It is sufficient if the juror can lay aside his impression or opinion and render a verdict based on the evidence presented in court. [Citations.]" (*Irvin v. Dowd* (1961) 366 U.S. 717, 723.)

Zavalza Ruiz also argues that the trial court improperly relied on Evidence Code section 1150 in deciding not to conduct a further inquiry into Juror No. 4's alleged misconduct. We disagree. This argument ignores the context of the trial court's remarks. In explaining its decision, and immediately before referencing Evidence Code section 1150, the trial court noted, "[c]ase law says, *even at a post trial post judgment motion for new trial*, you can't inquire to the content of jury deliberations, the deliberative process or mental state of jurors during the deliberative process." (Italics added.) It is clear from the record that the trial court did not *rely* on Evidence Code section 1150 in declining to conduct a further inquiry but instead cited the statute in order to emphasize the barriers protecting "the sanctity of the deliberations … [citation]." (*Fuiava*, *supra*, 53 Cal.4th at p. 710.)

Zavalza Ruiz relies on *People v. Russell* (2010) 50 Cal.4th 1228 (*Russell*) to support his argument that the trial court could have further inquired into whether Juror No. 4's feelings were affecting his ability to deliberate without impermissibly interfering with the deliberative process, but we find that case inapposite. In *Russell*, after the jury

began deliberations, one juror sent a note to the trial court advising that a second juror (Juror No. 8) appeared to be " 'unable to set aside her empathy for the defendant,' 'unable to set aside her own personal experience relating to mental illness,' and that 'she seems to be suffering personal angst during the process stating "pick on somebody else, I can't do this anymore." "I've had it!" "Can I abstain?" ' " (*Id*. at p. 1248.) After the jury foreperson confirmed that there was an issue with Juror No. 8, the trial court asked "the foreperson to explain how jurors were 'deliberating or refusing to deliberate.' " (*Ibid*.) The foreperson explained that the Juror No. 8 "was not refusing to deliberate, because she was actively discussing the case, but … '[t]hat she feels sorry for him,' 'identifies with his plight so much that she … has projected,' and 'she is describing an emotional state … that she feels that she shares with the defendant … [and that] she used … as the basis of her decision.' " (*Id.* at p. 1249.) The foreperson further "explained that Juror No. 8 seemed particularly emotionally invested in, and emotionally drained by, the deliberations." (*Ibid*.) The trial court agreed with the People's argument that, because it appeared Juror No. 8 was "basing her decision upon personal experience instead of the evidence, against the court's instruction, … direct inquiry of Juror No. 8 was mandated." (*Ibid*.) In that inquiry, Juror No. 8 denied that "her feelings of sympathy for defendant interfered with her deliberative process[] … [and] explained that she understood both that it would be unfair and against the law to allow her sympathy for defendant to interfere with the deliberative process, and that she understood that she could not allow a particular personal event in her background to interfere with or influence her objectivity." (*Ibid*.) The California Supreme Court concluded that the trial court did not abuse its discretion by conducting this minimal intrusion "to satisfy its dual goals of investigating allegations of misconduct while preserving the secrecy of the deliberative process." (*Id.* at p. 1252.)

22

Unlike the juror in *Russell*, however, there was no indication that Juror No. 4 was being guided by anything other than the evidence and arguments presented at trial. Without some suggestion that Juror No. 4 was "basing [his] decision upon personal experience instead of the evidence, against the court's instruction," there was no reason for the court to inquire further. (*Russell*, *supra*, at p. 1249; *Fuiava*, *supra*, 53 Cal.4th at p. 703.)

Accordingly, we conclude there was no abuse of discretion in the trial court's decision to not hold an evidentiary hearing or make any further inquiry related to Juror No. 4.

### C. Prior acts of domestic violence

Zavalza Ruiz contends that the trial court erred by admitting evidence of prior incidents of domestic violence to show propensity under Evidence Code section 1109. In his view, the prejudicial nature of that evidence outweighed its minimal probative value, and the evidence should have been excluded pursuant to Evidence Code section 352. We disagree.

### 1. Additional background

Prior to trial, the prosecution brought an in limine motion to admit evidence of three prior acts of domestic violence committed by Zavalza Ruiz pursuant to Evidence Code section 1109 and defense counsel moved to exclude that evidence.

The first incident occurred on May 14, 2015, when R.H. saw Zavalza Ruiz pushing, slapping, and tripping B.C., who Zavalza Ruiz admitted was his girlfriend. The next incident took place on May 9, 2017, where Zavalza Ruiz fought with his girlfriend A.B., " 'slamming' [her] on to the ground" and was subsequently convicted of false imprisonment. The next two events involved Zavalza Ruiz's girlfriend, M.V., who reported that Zavalza Ruiz slapped her hard enough on the shin and thigh to cause bruising and also gave her a bloody nose during an argument on January 3, 2020. M.V.

also reported that, on January 7, 2020, during an argument with Zavalza Ruiz, he slapped her in the face and pulled her off the bed which caused her to hit her face on the floor. Zavalza Ruiz was subsequently convicted of two counts of domestic violence for these incidents.

At the hearing on the motions in limine, defense counsel confirmed that "the principal thrust" of the defense case would be that the collision with the tree was an accident and not an intentional act. The court noted that the evidence of each prior incident of domestic violence was probative not just to the issue of propensity but also to the element of intent under Evidence Code section 1101, subdivision (b). The court granted the prosecutor's motion in limine, concluding that the probative value of the evidence outweighed its prejudicial effect. As to the incidents involving M.V., the trial court ordered that, "to avoid any potential for undue prejudice[,]" there would be no mention of or questioning regarding M.V.'s age.[18]

### 2. Applicable legal principles

"Character evidence, sometimes described as evidence of a propensity or disposition to engage in a type of conduct, is generally inadmissible to prove a person's conduct on a specified occasion." (*People v. Villatoro* (2012) 54 Cal.4th 1152, 1159; Evid. Code, § 1101, subd. (a).) However, the Legislature has created certain exceptions to the prohibition against admitting propensity evidence in cases involving sexual offenses (Evid. Code, § 1108, subd. (a)), and domestic violence (*id.*, § 1109, subd. (a)(1)).

Evidence Code section 1109, subdivision (a)(1) provides, as follows: "Except as provided in subdivision (e) or (f), in a criminal action in which the defendant is accused of an offense involving domestic violence, evidence of the defendant's commission of

---

[18] At the time M.V. was involved with Zavalza Ruiz, she was a minor and he was an adult.

24

other domestic violence is not made inadmissible by Section 1101 if the evidence is not inadmissible pursuant to Section 352." " 'Domestic violence' has the meaning set forth in Section 13700 of the Penal Code. Subject to a hearing conducted pursuant to [Evidence Code] [s]ection 352, which shall include consideration of any corroboration and remoteness in time, 'domestic violence' has the further meaning as set forth in Section 6211 of the Family Code, if the act occurred no more than five years before the charged offense." (Evid. Code, § 1109, subd. (d)(3).)

The California Supreme Court has previously rejected the argument that Evidence Code section 1108 violates a defendant's right to due process in *People v. Falsetta* (1999) 21 Cal.4th 903 (*Falsetta*). *Falsetta* held that "the trial court's discretion to exclude propensity evidence under [Evidence Code] section 352 saves [Evidence Code] section 1108 from [a] due process challenge." (*Id.* at p. 917.) Although the California Supreme Court has not specifically ruled on the constitutionality of Evidence Code section 1109— a parallel provision to Evidence Code section 1108—Courts of Appeal have consistently concluded that Evidence Code section 1109 does not violate principles of due process under the reasoning in *Falsetta*. (See, e.g., *People v. Mani* (2022), 74 Cal.App.5th 343, 376; *People v. Hoover* (2000) 77 Cal.App.4th 1020; *People v. Johnson* (2000) 77 Cal.App.4th 410, 420.)

Evidence Code section 352 provides: "The court in its discretion may exclude evidence if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury." " '[A] court need not expressly weigh prejudice against probative value or even expressly state that it has done so, if the record as a whole shows the court was aware of and performed its balancing functions under Evidence Code section 352.' " (*People v. Doolin* (2009) 45 Cal.4th 390, 438.)

25

When engaging in a "careful weighing process under [Evidence Code] section 352 . . . trial judges must consider such factors as [the evidence's] nature, relevance, and possible remoteness, the degree of certainty of its commission and the likelihood of confusing, misleading, or distracting the jurors from their main inquiry, its similarity to the charged offense, its likely prejudicial impact on the jurors, the burden on the defendant in defending against the uncharged offense, and the availability of less prejudicial alternatives to its outright admission, such as admitting some but not all of the defendant's other [] offenses, or excluding irrelevant though inflammatory details surrounding the offense." (*Falsetta, supra*, 21 Cal.4th at p. 917.) Nevertheless, the determination is "entrusted to the sound discretion of the trial judge who is in the best position to evaluate the evidence." (*Id.* at pp. 917–918.) A trial court's exercise of discretion under section 352 will not be overturned "in the absence of manifest abuse, upon a finding that its decision was palpably arbitrary, capricious and patently absurd." (*People v. Jennings* (2000) 81 Cal.App.4th 1301, 1314.)

### 3. Analysis

Here, the prosecution offered the evidence of Zavalza Ruiz's prior acts of domestic violence against B.C., A.C., and M.V. under Evidence Code section 1109 in order to show his propensity to engage in domestic violence against D.G. Before permitting the prosecution to admit this evidence, the trial court evaluated it under Evidence Code section 352, determining that its probative value was not substantially outweighed by its potential prejudice. As explained below, we conclude that the trial court did not abuse its discretion in admitting the evidence.

The prior incidents were relevant and sufficiently similar in nature to the charged offenses. " ' "The principal factor affecting the probative value of an uncharged act is its similarity to the charged offense." ' " (*People v. Johnson* (2010) 185 Cal.App.4th 520, 531; *Falsetta, supra*, 21 Cal.4th at p. 917 [trial court should consider factors including

26

"similarity to the charged offense"].)  M.V. and A.C. testified that Zavalza Ruiz was controlling, jealous, and became more aggressive when they tried to leave him. M.V. testified that, after Zavalza Ruiz hit her in the face during an argument, she got out of the car and tried to run, but he dragged her back to the car.  This echoed N.G.'s testimony of what D.G. said about running from the car prior to the crash only to have Zavalza Ruiz grab her hair, hit her, and drag her back to the car.

While there are dissimilarities between the prior incidents and the charged offenses, most notably in the means by which Zavalza Ruiz injured D.G. and the severity of her injuries, "dissimilarity alone does not compel exclusion of the evidence."  (See *People v. Cordova* (2015) 62 Cal.4th 104, 133 [addressing admissibility of uncharged sex offenses under Evidence Code section 1108].)  In this case, Zavalza Ruiz's prior acts of domestic violence provided evidence of a propensity to react angrily and violently when his intimate partners attempted to end the relationship.

The evidence of domestic violence against B.C., A.C., and M.V. was neither inflammatory nor especially remote in time.  The injuries described consisted of bruises, bloody noses, and a ripped fingernail.  The most remote incident was that described by R.H. against B.C, which took place in 2015, six years before the injuries to D.G., whereas the other incidents occurred in 2017 and 2020.  Evidence Code section 1109, subdivision (e) provides that "[e]vidence of acts occurring more than 10 years before the charged offense is inadmissible under this section, unless the court determines that the admission of this evidence is in the interest of justice."  All of the prior incidents admitted by the trial court took place well within the 10-year period allowed for under Evidence Code section 1109.

Furthermore, the trial court found that the prior incidents were admissible as evidence of intent under Evidence Code section 1101, subdivision (b).[19]  Evidence Code section 1101 requires the least degree of similarity between the prior conduct and the charged offense to negate accident or prove intent.  (*People v. McCurdy* (2014) 59 Cal.4th 1063, 1096–1097.)

Here, the trial court determined that the probative value of the prior incidents of domestic violence was not substantially outweighed by the potential prejudice relative to the admission of such evidence.  Thus, the evidence was admissible under Evidence Code section 1109.  The court even acted to minimize the prejudice to Zavalza Ruiz by ensuring that the jury would not hear that M.V. was a minor and Zavalza Ruiz was an adult at the time of their relationship.  Under these circumstances, we conclude the court did not abuse its discretion in admitting the evidence of prior domestic violence incidents.

### III.    DISPOSITION

The judgment is affirmed.

---

[19] As noted above, evidence that Zavalza Ruiz committed other incidents of domestic violence is not made inadmissible by Evidence Code section 1101 if the evidence is not inadmissible pursuant to Evidence Code section 1109.  (*People v. Merchant* (2019) 40 Cal.App.5th 1179, 1192.)  Consequently, we need not and do not address Zavalza Ruiz's argument that the trial court abused its discretion in admitting this evidence under Evidence Code section 1101.

28

_____

WILSON, J.

WE CONCUR:


_____

GREENWOOD, P. J.


_____

DANNER, J.


People v. Zavalza Ruiz
H049946